UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

Case No. 9:13-cv-81197

ADT LLC,

     Plaintiff,

          v.                           **JURY TRIAL DEMANDED**

VISION SECURITY LLC,

     Defendant.

_____/

## SECOND AMENDED COMPLAINT

     Plaintiff ADT LLC ("ADT"), through its undersigned counsel, brings this action for injunctive relief, compensatory and punitive damages, and attorney fees against Defendant Vision Security LLC ("Vision"), and in support alleges:

## SUMMARY OF THE CASE

     1.     This is an action for injunctive relief, damages and attorney fees arising from Vision's false and deceptive sales practices under the Lanham Act, the Florida Deceptive and Unfair Trade Practices Act, and the Florida common law of unfair competition.  ADT sued Vision for unfair competition just last year in this Court.  *See ADT LLC v. Security Networks & Vision Security*, No. 9:12-cv-81120 (Hurley, J.) ("Prior Action").  That suit concluded in an August 26, 2013, settlement [Prior Action DE 104-2] in which Vision agreed to a permanent injunction ("Agreed Permanent Injunction") forever barring its sales agents from making false sales pitches to ADT's customers. [Prior Action DE 105.]  Since then, ADT has learned that Vision methodically trains its

sales agents to lie to ADT's customers, and that Vision continues to send sales agents into the field to sell alarm systems using false sales pitches that are expressly forbidden by the Agreed Permanent Injunction.  Because the Agreed Permanent Injunction bars only false pitches by Vision and its agents to ADT customers, and not Vision's own training and direction of its sales force, ADT brings this new action to seek additional relief from Vision's newly-discovered systemic misconduct.

## PARTIES

2.      Plaintiff ADT is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431.

3.      Defendant Vision is a foreign limited liability company organized under the laws of Utah, with its principal place of business at 508 W 800 N, Orem, Utah 84057. Vision registered with the Florida Department of State to transact business in Florida in December 2007, and has been registered to do business in Florida continuously since then.  Vision's registered agent for service of process is API Processing, 3419 Galt Ocean Drive, Suite A, Fort Lauderdale, Florida 33308.  Vision has worked at all times since 2008 as an agent of Security Networks, LLC, a Florida company located in West Palm Beach, Florida.  Together, Vision and Security Networks acquire, equip, and monitor new security services customer accounts in interstate commerce across the United States.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to section 1331 of title 28 because it presents a Federal question under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

5.     The Court has jurisdiction over Vision because Vision is found in Florida, Vision conducts business in Florida related to the claims asserted, and Vision has submitted to the exclusive jurisdiction of this Court with respect to all matters arising from or relating to the Prior Action.

6.     This Court has jurisdiction over the state-law claims asserted in this action pursuant to section 1367(a) of title 28, and also pursuant to section 1332(a) of title 28.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     Venue lies in this District pursuant to section 1391(b) of title 28 because the parties are found in this District, and the parties have agreed by prior contract to proceed in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

8.     ADT is the largest and best-known provider of electronic security services and equipment for homes and businesses in the United States.

9.     ADT sells electronic security services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

10.     Vision also sells electronic security services and equipment in a number of states across the nation in direct competition with ADT.  Vision sells alarm systems as an agent for Security Networks.  When Vision concludes a sale of an alarm system, the new customer signs a contract with Security Networks.  Vision is Security Networks' largest agent, in a network comprised of 300 "affiliates" that together have generated 200,000 current Security Networks customers.  In August 2013, Monitronics International, Inc., purchased Security Networks in a transaction valued at over $500 million dollars.  Much of that value was built by Vision.

3

11.     ADT and Vision sell the electronic alarm systems to the same target customers.  Neither company manufactures alarm equipment.  Instead, ADT, Vision, and their competitors purchase alarm equipment primarily from the same manufacturers – typically, from GE Security (a United Technologies company), Honeywell, or 2Gig. ADT's customers have no contractual relationship with any of these manufacturers.

12.     In the Prior Action, ADT alleged that Vision sales representatives, acting at all times as agents of Security Networks, had sold alarm systems to ADT customers using false sales pitches.  ADT's complaint recounted customer reports from the summer of 2012 that Vision's sales agents had led them to believe the agent either was representing ADT, or else was representing the manufacturer of the customer's alarm system.

13.     Security Networks and Vision at all times disavowed any systemic effort by either company to engage in false sales pitches.  Both companies repeatedly insisted, by representations of counsel as well as by officer affidavits, that any Vision agent who engaged in such misconduct was an isolated "rogue" actor, violating the express directions of Vision and Security Networks.

14.     ADT relied on these representations when it agreed to settle the Prior Action.  Based on these representations, ADT agreed to an injunction that barred misconduct only by Vision agents, without demanding more stringent restrictions on the corporate behavior of Vision and Security Networks.  The Agreed Permanent Injunction bars Vision's sales agents from stating, *inter alia*, that they are acting on ADT's behalf; that they are with an alarm equipment manufacturer; that they are performing maintenance on ADT's equipment, or providing an "upgrade" of ADT's equipment; or

that they are acting at the direction of any governmental agency.  The Agreed Permanent Injunction also forbids Vision agents from making any other statement that they know to be false.

15.     Based in part on defendants' insistence that the false sales pitches had been the work of "rogue" sales agents, ADT agreed to release all claims against Vision as of August 26, 2013, the date of the settlement.

16.     In fact, those representations were knowingly false, and were made to induce ADT to settle with Vision on much more lenient terms than ADT would have demanded had Vision made full disclosure of its systemic misconduct.

*Vision's structure*

17.     Vision is owned by Robert Harris.  Robert Harris actively operates Vision.

18.     Robert Harris relies on a handful of regional managers, who report directly to him, to operate Vision's sales efforts.  Each regional manager oversees Vision's sales operations in several states, through other managers who in turn supervise the individual sales agents.

19.     Vision's regional managers are responsible for training the hundreds of Vision sales agents who sell door-to-door in their respective regions.

20.     Since the settlement of the Prior Action, Vision employees have provided ADT with copies of audio and video recordings of Vision training sessions conducted by one Vision regional sales manager, Brett Harris.  Brett Harris managed a team of about 100 Vision managers and sales agents who sold alarms in Arizona in early 2013.  In April 2013, the team moved to St. Louis and Kansas City, Missouri, where the team sold

alarms in Missouri and Kansas.  In September 2013, members of the team moved to Iowa to sell alarms in that state as well.

21.     Brett Harris is one of the top sales generators for Vision.  A Vision website, http://www.visionnextlevel.com/About-Us.html, shows Brett Harris as the top producer of Vision sales.  One of the Vision sales agents quoted there, Patrick Morton, expresses his "respect" and "loyalty" to Brett Harris as "a great leader" of Vision.

22.     In June 2013, Robert Harris expanded Brett Harris's duties to manage the operation of Vision's Texas region from Austin, Texas.

23.     Brett Harris reports directly to Robert Harris.  Robert Harris supervises Brett Harris's management of Vision's sales efforts in Arizona, Missouri, Kansas, Texas and Iowa.  Brett Harris works closely with Robert Harris, and they speak on a daily basis.

*Recordings of Vision's training of its sales agents.*

24.     Brett Harris first assembled a Vision regional sales team in Tempe, Arizona, in early 2013.  The team met on a daily basis, and grew to include one hundred managers and agents.  Each week, Brett Harris walked the agents through sales training exercises that consisted of role-playing various door-to-door sales presentations.

25.     Brett Harris told the sales agents to record these role-playing sessions, and to commit the dialogues to memory for use in soliciting ADT customers for Vision.  The sales agents did record the sessions, referred to the recordings daily, and traded the recordings with other sales agents at Brett Harris's direction.  Hundreds of copies of these recordings now circulate among sales agents, in and out of Vision.

26.     Altogether, ADT has received three audio recordings and one video recording of these training sessions, has attached transcripts of each to ADT's motion for

preliminary injunction, [DE 6-3 through DE 6-6] and incorporates them by reference here.

27.     The video recording captures a training presentation that Brett Harris staged in Arizona in March 2013.  Most agents attended this presentation because Vision's owner, Robert Harris, was visiting the team.  Robert Harris was present in the room when Brett Harris performed the training session captured in the video.

28.     During that presentation, Brett Harris demonstrated the following false sales pitch.  The pitch, when used in door-to-door sales, violates the preliminary injunction entered in the Prior Action in December 2012 and then in force, as well as the later Agreed Permanent Injunction.  Brett Harris instructed Vision's sales agents to pose as GE technicians and to use the following false sales pitch when selling new Vision services to ADT customers:

> We're with GE, okay?  We're the makers of all the equipment you guys have in the home, so we do business with all the security companies. ADT is one of them.  The reason why we're out here is we're just taking down those old panels, popping up a new one for you, nothing that you have to pay for, okay?
>
> You've got to say that right off the bat, okay?  Nothing you have to pay for, because you don't want them to say, oh, no, we're good, because they're thinking, oh, great, he's going to try to sell me something, okay?
>
> So we're just taking down the old panels and popping up a new one for you, nothing that you guys have to pay for.  In fact, we're doing it because police, fire, and medical departments nationwide want you to have the two-way voice on the keypad.  *   *   *
>
> So all we're doing is we're going to just take down that old one, pop up the new one for you, and then you guys will have that live response that will also cut back on false alarms.  See, the system you have now, it's good, don't get me wrong, but with the technology we have now, it's gotten even much better.  This way if you guys ever had a false alarm, you

guys wouldn't have to worry about a police officer showing up at the door. They'll just come over the intercom and talk directly to you, okay?  *  *  *

Now, about two weeks ago, GE sent out a letter, and they asked if you did your clean-up status on your keypad.  Did you guys get a chance to do that?  You probably threw it away.  I'll tell you what, let me just take a look at your keypad, and I'll, I'll tell you if you need the update, okay?

So then I go up to the keypad, right?

Oh, wow, what are -- you know what? This is an antique. You could probably get some money for this, girl. No, I'm just joking.

So what we're going to do is we're just going to take down this one right here and put up a new one for you, and you'll have that live response, okay?  Like I said, the police department is trying to cut back on false alarms, so with you having that two-way voice, they don't have to worry about spending manpower when they could be out, you know, helping out somebody that needs them a little bit more.  *  *  *

Well, what we're doing is we're out here from a liability standpoint as well. GE doesn't want to have any liability on their hands.  *  *  *

So what I'm thinking is what we'll do is we're already going to go ahead and take down the panel and put up a new one for you.  I'm going to get you a glass break sensor, again, nothing you have to pay for, okay? Got to say that, nothing you have to pay for, but we'll put it right centrally located in the home so it detects that sound of broken glass for you, okay? All right.  Go ahead and have a seat.  I'm telling her to have a seat in her own house, right?  All right, boom, and we're putting in the system, guys.

Now, here's the thing: The only think you were probably wondering the whole time was how's he going to tell her about switching over from ADT to Security Networks, right, the new company.  Very simple.  *  *  *

Yeah, we'll take care of all of it.  We want to update your system. You've been a customer of ours several years.  We want to make sure that we take good care of you, okay?  *  *  *

[T]he equipment is going to be the same brand.  It's going to be, it's going to be all the same.  However, the one thing that's going to change is that GE is now using a different company for monitoring.  Now,

8

they do the same exact thing as what ADT does.  And in fact, ADT is still
a really good company, but we're using a different company called
Security Networks, mostly because they have a much better rate with the
Better Business Bureau, and they do way better customer service for you.

29.     Remarkably, this sales pitch makes no fewer than thirteen false statements,
each in violation of Section 43(a)(1)(A) of the Lanham Act and the provisions of the
Agreed Permanent Injunction.

30.     First:  The seller falsely claims to be "with GE," claiming a false
affiliation with the alarm equipment manufacturer.

31.     Second:  The seller impersonates a technician to mislead the customer
from recognizing the sales pitch as a solicitation, so the customer will not think, "he's
going to sell me something."

32.     Third:  The seller falsely claims to be providing an upgrade of the
customer's existing ADT alarm system.

33.     Fourth:  The seller's statements that the new equipment is "nothing you
have to pay for" mislead by reinforcing the seller's false representation that he is a GE
technician visiting to upgrade the customer's existing alarm system.

34.     Fifth:  The seller falsely claims that the upgrade is required by local police
and fire departments.

35.     Sixth:  The seller falsely claims that GE is requiring the upgrade to protect
itself from liability.

36.     Seventh:  The seller falsely claims that GE sent the customer a letter
regarding the customer's "clean-up status" (a meaningless term meant to confuse the
customer) in anticipation of the seller's visit.

37.     Eighth:  The seller falsely claims to occupy a contractual relationship with the customer by stating, "You've been a customer of ours for several years."

38.     Ninth:  The seller falsely suggests that GE is involved in the use of the alarm equipment, and that GE decides which companies should monitor the equipment.

39.     Tenth:  The seller falsely states that GE wants the customer to switch alarm system providers from ADT to Security Networks.

40.     Eleventh:  The seller falsely states that Security Networks, which is not an accredited member of the Better Business Bureau, and which has a "C+" rating from the Bureau, has a "much better rate" with the Bureau, and that Security Networks provides "way better customer service" than ADT.  The seller does not disclose that Vision is not accredited by the Better Business Bureau, and that Vision has a "D-" rating with the Bureau because of "a pattern" of hundreds of "complaints alleging misrepresentation during initial contact with the sales representative."

41.     Twelfth:  The seller falsely states that the customer's existing alarm equipment is unreliable, outdated, easily disarmed, and susceptible to false alarms.

42.     Thirteenth:  The seller aims to have the customer's ADT alarm panel torn out, and a new Vision alarm panel installed, before disclosing that the "upgrade" in fact requires the customer to change alarm system providers from ADT to Security Networks.

43.     The other recordings received by ADT document similar role-playing training sessions by Brett Harris with Vision sales agents.  Countless other recordings have been made of these training sessions by Vision agents-in-training at Brett Harris's direction.

44.     These recordings make it clear that ADT is a target of Vision's false sales presentations.  The recording excerpted in Paragraph 28 above includes numerous references to ADT.  In another recording, Brett Harris encourages Vision sales agents to target ADT customers using these false pitches:

> So I want you to get really confident when you see these [ADT] signs. Like me, when I see an ADT sign now, my eyes light up.  I'm like, oh, yeah, because here's the thing I want you to think about.  They already have security, they're already safety conscious people, and nothing changes, because what they're going to say is, okay.  Well, does this change my monthly monitoring?  No, it stays the same.  It's just 39 plus tax, that's, all of it is just like you're paying Vector and ADT.  They all do the same, okay?

45.     These training sessions continued on a daily basis after the Arizona team moved to Missouri and Kansas in early April 2013.  At times Brett Harris changed the pitches to use the names of other equipment providers, such as 2GIG.  In another audio recording from a later training session, for example, Brett Harris instructs Vision sales agents to use the following false pitch:

> BRETT HARRIS:  -- you know, you need to act as if you are a technician, you're there about business, okay?  *   *   *
>
>         I see you guys are customers with us.  …  Remember that:  I see that you guys are customers with us, okay?  *   *   *
>
>         Now, this is very important that you say this.  Now, I work with, with General Electric or I work with 2GIG Technology, okay? I'm getting all the badges switched to 2GIG Technology, okay?  And this is what I want you to say.  Now, we provide a lot of the security equipment for most of the security companies, okay?  Now, let me back up.  *   *   *
>
>         Well, my name is Brett, and I actually work with 2GIG Technology. We're responsible for doing most of the security, putting in for most of the companies out here like ADT, (inaudible) and a lot of those companies.  Now, just judging by that sign, with you guys

having the system so long, the reason why we're out here is because we've had some issues with some of our panels, okay?  Now, is one of your keypads or does your keypad look like one of these?  *  *  *

This one here?  Okay.  This is on our list right now of systems that we provide that are on a liability status which means we're switching them out.  We're taking out the old panels and we're popping in a new one. It's nothing you have to pay for, okay?  *  *  *

Questions about that presentation?  Nobody has any?

BOB:  Well, no questions, but again, how many times do you get stopped and say, oh, are you with ADT?  *  *  *

BRETT HARRIS:  So how many of you guys are getting stuck when they say, well, are you with ADT?  A lot of you guys.  That's when you, you convert that and you say, no, remember, I told you I'm with 2GIG Technology or I'm with GE, okay?  And we provide the equipment that's in the homes for most of the security companies, okay?

PAUL:  I got a question on that.  Like what you're saying (inaudible) how do you know about us and why are you out here?

BRETT HARRIS: Oh, because we provide a lot of the equipment for ADT, and most of the people who have ADT have our systems in the house. They say, well, (inaudible). We're just updating the keypad for you so that we don't have any liability on our hands.  (inaudible) Police and fire departments nationwide want you to have a panel that looks like this one so that you have two-way voice and they can receive directly through the intercom from you and they can cut back on false alarms. The police and fire departments are getting a little tired of spending manpower and time and energy on going out to homes where there's not even a break-in, okay?

46.    On information and belief, other Vision regional managers trained their

respective sales agents to use the same false sales pitches.  The pitches appear to be in

common use throughout Vision's sales territories.  As alleged in detail below, ADT has

received reports from its customers in California, Oregon, and Nevada of encounters with

Vision sales agents using variants of the Brett Harris pitch – states outside Brett Harris's

sales regions.  Similarly, the Better Business Bureau of Utah has received complaints

from consumers in Indiana and Illinois, also outside Brett Harris's sales regions, who

reported the same false "with GE" pitch by Vision agents.

*Vision's knowledge of and acquiescence in the false sales techniques.*

47.     Vision owner Robert Harris observed Brett Harris's training presentation

captured in the video described at Paragraph 28 above.  Neither Robert Harris nor any

other Vision officer reprimanded Brett Harris.

48.     Neither Robert Harris nor any other Vision officer instructed Brett Harris

to stop training Vision agents to use these false sales pitches, or directed that any

remedial training be conducted.

49.     Instead of reprimanding or firing Brett Harris, Robert Harris expanded

Brett Harris's responsibilities to include the management of Vision's Texas region.

50.     In June 2013, a sales agent under Brett Harris's supervision was caught

impersonating an ADT sales agent in the city of St. Louis.  The incident sparked

extensive media coverage.  Robert Harris was aware of the incident.

51.     In response, Robert Harris convened a conference call with Vision's sales

agents, in which Vision's lawyer instructed the agents not to employ false sales pitches.

Since that call, Vision has taken no further measures to ensure that its hundreds of sales

agents conduct themselves in compliance with the law of unfair competition and the

injunctions entered in the Prior Action.

52.     At no time did Vision instruct its sales agents to comply with the

requirements of the preliminary injunction entered in the Prior Action, or the

requirements of the Agreed Permanent Injunction – both of which are aimed at regulating

the conduct of Vision's sales agents.  At no time did Vision provide its sales agents with copies of the preliminary injunction or the Agreed Permanent Injunction entered in the Prior Action.

53.    No Vision employee was ever fired or reprimanded as a result of the June 2013 incident.  The sales agent was permitted to continue to sell Vision alarms without restrictions.  Brett Harris continued to manage Vision's sales in Kansas, Missouri and Texas, as before.  Robert Harris's only operational change in response to the incident was to move Vision's sales force out of the city of St. Louis, only because the publicity caused by the incident had poisoned the St. Louis market for Vision.

54.    Robert Harris and Vision's other officers are well-aware that Vision has received hundreds of complaints about these sales tactics, and that those complaints continue to arise following entry of the Agreed Permanent Injunction.  They have been publicized in the media, and they are the subject of lawsuits by state attorneys-general. The Better Business Bureau of Utah has received hundreds of complaints against Vision based on these tactics, gives Vision a "D-" rating, and warns consumers that Vision "has a pattern of complaints alleging misrepresentation during initial contact with the sales representative."  Robert Harris is Vision's main contact with the Better Business Bureau, and has had extensive meetings and conversations with the Bureau regarding Vision's complaint history and sales practices.

55.    Vision, by its owner, was aware of the systemic use of these false sales pitches when it represented to the Court and to ADT in the Prior Action that such pitches violated Vision company policy, and that any such false sales pitches were entirely the work of isolated "rogue" sales agents.

*Vision's ongoing misconduct after the settlement and release.*

56.     Vision has continued to use these false sales pitches following the August 26, 2013, settlement in the Prior Action.  Vision sales agents report that Vision managers continued to direct the use of these scripted sales pitches throughout the month of September 2013, Vision's "extension" sales season.  On information and belief, Vision has continued to train sales agents to use these pitches following the settlement, and continues to deploy these agents in the markets in which Vision operates.

57.     ADT and the Better Business Bureau of Utah continue to receive reports from customers who were misled into believing that the Vision agent was a technician visiting to perform an upgrade of the customer's existing alarm system, and who recount various versions of the Brett Harris pitch in their complaints to the Bureau and ADT.

58.     Betty Schwartz, an 88-year-old ADT customer residing on Shannon Way in Palm Springs, California, reports that on December 2, 2013, a Vision agent named Chris Delguidice visited her home and introduced himself to her as "a representative of GE, the manufacturer of [her] ADT alarm system," and that he had been sent to upgrade her ADT alarm system.

59.     Lucinda Duran, an ADT customer residing on Ruthby Street in Houston, Texas, reports that on December 21, 2013, a Vision agent visited her home claiming to be a technician visiting to service and upgrade her family's ADT alarm equipment.  The agent told Ms. Duran that she needed to upgrade her alarm system to keep it within the warranty period.  Ms. Duran's husband agreed to the installation and signed a contract for new services with Vision, believing it to be a receipt for the upgrade and warranty.

60.     Ronald Stroble, an ADT customer residing on Caber Way in Antelope, California, had called ADT to request an upgrade of his alarm system.  Mr. Stroble reports that on November 15, 2013, two Vision agents wearing Vision insignia visited his home and said they were visiting to upgrade his ADT alarm panel.  Mr. Stroble sent them away after seeing the Vision insignia and confirming they worked for Vision.  Later the same day, a third Vision agent, in plain clothes, visited and said he had come to upgrade his ADT alarm system.  Mr. Stroble granted the third Vision agent access to his home to upgrade the system, believing the visit to have been authorized by ADT in response to his earlier call.

61.     Debra Smith, an ADT customer residing on Beck Creek Lane, in Patterson, California, reports that on October 3, 2013, a Vision agent named Art Vorhassen visited her home and introduced himself to her as a representative of GE, and that he had been sent to inspect her ADT alarm system, and to upgrade it at no charge.

62.     Dave and Baljit Singh, ADT customers residing on West Pintail Way in Elk Grove, California, report that on September 17, 2013, a Vision agent named Lance Riddick visited their home, and stated that he was working with ADT to upgrade ADT's systems in their neighborhood.

63.     Tommy Cobb, an ADT customer residing on East 10th in Caruthersville, Missouri, reports that on November 14, 2013, a Vision agent named Miranda Holliman visited his home, and stated that she had been sent to upgrade the Cobbs' ADT alarm system.

64.     Janis Browne, an ADT customer residing on Southwest 143rd Avenue in Beaverton, Oregon, reports that on October 12, 2013, a Vision agent named Jordan

visited her home with another agent, and stated that they were visiting to update Ms. Browne's ADT alarm equipment; the two agents disclosed their Vision affiliation only after installing a new Vision alarm system in Ms. Browne's home, and provided a business card bearing the name of Andrew Hurst.

65.    Toni Chandler, an ADT customer residing on Milben Circle in Palm Springs, California, reports that on October 24, 2013, a Vision agent named Brandon visited her home, stated that he was visiting to update Ms. Chandler's ADT alarm service, replaced her ADT alarm system with a Vision system, and had Ms. Chandler sign a new Vision contract.

66.    James Crow, an ADT customer residing on Walnut Hills Way in Fair Oaks, California, reports that on November 9, 2013, a Vision agent visited his home around 2:00 p.m. wearing a GE logo, and said he was visiting to upgrade Mr. Crow's ADT alarm system.

67.    Debra Marcus, an ADT customer residing on Flinthead Drive in North Las Vegas, Nevada, reports that on November 13, 2013, two Vision agents (one named Seth) visited her home at 12:30 p.m., stated they were with Honeywell GE, and stated that they had been sent to upgrade Ms. Marcus's ADT alarm system.

68.    Anthony Araujo, an ADT customer residing on Bootjack Drive in Sacramento, California, reports that on November 15, 2013, a Vision agent named Brady Sessions visited his home, stated that he worked for Honeywell, and that he was visiting to provide a free upgrade of Mr. Araujo's ADT alarm system.

69.    Karen Beck, an ADT customer residing on Southeast Hood Street in Clackamas, Oregon, reports that on November 22, 2013, a Vision agent named Jordan

visited her home and stated that he was visiting to provide a free upgrade to Ms. Beck's Brinks (ADT) alarm system.

70.     Barbara Wynder, an ADT customer residing on Simple Farm Road in Hampton, Virginia, reports that a Vision agent visited her home on or about October 1, 2013 and stated that he was visiting on behalf of ADT to provide a free upgrade to Ms. Wynder's ADT alarm system.  Ms. Wynder accepted the upgrade and signed a new Vision contract.

71.     Philip and Bonnie Novosel, ADT customers residing on Sprangletop Avenue in Baytown, Texas, report that in late December 2013, a Vision agent visited their home and stated he was visiting to provide a free upgrade of the Novosels' ADT alarm system.  The Novosels accepted the offer and signed a Vision contract.  The Novosels report that they have reported the incident to their local police department.

72.     Better Business Bureau complaints also confirm the ongoing use by Vision of agents employing this abusive sales tactic.  The Bureau's web page for Vision, (http://www.bbb.org/utah/business-reviews/burglar-alarm-systems-dealers-monitoring-and-service/vision-security-in-orem-ut-22172331) accessed January 16, 2014, states: "This company has a pattern of complaints alleging misrepresentation during initial contact with the sales representative.  Complainants allege that they are told the representative is with their current provider to perform an 'upgrade.'"  The Bureau concludes:  "While the business has responded to the BBB's concerns and stated their policy when this type of action occurs, BBB has continued to receive complaints with the same underlying issue."

18

73.    On information and belief, based on the Vision customer complaints summarized on the Bureau's website (http://www.bbb.org/utah/business-reviews/burglar-alarm-systems-dealers-monitoring-and-service/vision-security-in-orem-ut-22172331/complaints), numerous additional instances of Vision's use of the Brett Harris sales techniques have been identified by the Bureau following the August 26 release, based on reports by ADT customers as well as by other consumers in the market.  While it is not possible to glean all details of each report from the information provided on the Bureau's website, the online records of the reports make it clear that in each instance Vision has engaged the customer in dialogue at the Bureau's request to resolve the dispute, and so Vision is well-aware of the name, location, date and circumstances of each complaint.

74.    According to Bureau Case No. 22153133, on September 1, 2013, a Vision agent named Stephen visited Lisa Mello at her home on Gardenia in Portage, Indiana. Stephen told Ms. Mello that he was visiting from GE, the company that made her alarm panel, to update Ms. Mello's alarm panel.

75.    According to Bureau Case No. 22154117, on September 24, 2013, a Vision agent visited Allison Collazo at her home on Nimitz Way in Mesquite, Texas. The agent identified himself as a GE representative, and stated that he was visiting to provide a free upgrade of Ms. Collazo's alarm panel.

76.    According to Bureau Case No. 22156802, posted to the Bureau's Vision web page on December 30, 2013, (http://www.bbb.org/utah/business-reviews/burglar-alarm-systems-dealers-monitoring-and-service/vision-security-in-orem-ut-22172331/complaints) on October 29, 2013, a Vision sales agent approached an ADT customer in her home, and stated that he was working in affiliation with ADT to upgrade

her alarm system; the consumer signed a five-year Vision contract in the mistaken belief that it was a receipt for the upgrade.  ADT does not yet have the customer's name or address, but Vision's response to the complaint posted on the Bureau's website proves that Vision is already aware of the particulars of this customer complaint.  ADT requires discovery to plead further details relating to this complaint.

77.     According to Bureau Case No. 22157823, posted to the Bureau's Vision web page on December 17, 2013, (http://www.bbb.org/utah/business-reviews/burglar-alarm-systems-dealers-monitoring-and-service/vision-security-in-orem-ut-22172331/complaints) on December 7, 2013, two Vision sales agents approached a customer in her home, identified themselves as agents of the manufacturers of the customer's alarm equipment, and stated that they were visiting to upgrade the customer's alarm equipment.  ADT does not yet have the customer's name or address, but Vision's response to the complaint posted on the Bureau's website proves that Vision is already aware of the particulars of this customer complaint.  ADT requires discovery to plead further details relating to this complaint.

78.     According to Bureau Case No. 22156189, posted to the Bureau's Vision web page on November 20, 2013, (http://www.bbb.org/utah/business-reviews/burglar-alarm-systems-dealers-monitoring-and-service/vision-security-in-orem-ut-22172331/complaints) a Vision sales agent approached the son of an ADT customer at his mother's home in East St. Louis, Illinois, and stated that he was visiting to provide a free upgrade to his mother's ADT alarm system.  ADT does not yet have the customer's name or address, but Vision's response to the complaint posted on the Bureau's website

proves that Vision is already aware of the particulars of this customer complaint.  ADT requires discovery to plead further details relating to this complaint.

79.    Fewer than three percent of aggrieved customers report misconduct to agencies such as the Bureau, or to ADT, so the complaints discussed above are but a very small fraction of the total number of customers encountering fraudulent sales practices by Vision agents.  For the same reason, complaints to the Bureau by customers of other alarm companies who report Vision's fraudulent sales pitches are probative of Vision's conduct in the market generally, and support the claims stated in this complaint.

80.    Brett Harris himself trained over one hundred Vision sales agents in the 2013 sales season to use these false sales pitches.  These agents, in turn, have circulated the audio and video recordings of the pitches to others in and out of Vision.  Moreover, sales agents move freely from alarm company to alarm company, and from sales region to sales region.  Many of these Vision agents now work for other companies, and more will migrate elsewhere, and take their training and their recordings with them.

81.    The ultimate impact of Vision's misconduct extends far beyond these one hundred agents whom Brett Harris trained in the 2013 Vision sales season.  Vision has unleashed a cadre of corrupted sales agents and training videos onto the market for electronic security services, aimed largely at ADT's customer base.  In the aggregate, Vision's training of sales agents to use fraudulent sales pitches in the market for alarm services causes injury to ADT far beyond the loss of any individual customer.  Vision is biasing and tainting the alarm services market in a systemic manner that endangers consumers, prejudices ADT and other competitors in that market who are committed to

the use of ethical business practices, and predisposes consumers in the market for alarm

services to suspect unethical business practices by those like ADT who participate in it.

**COUNT I**
**UNFAIR COMPETITION IN VIOLATION**
**OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)**

82.     ADT incorporates Paragraphs 1 through 81, as if set forth fully here.

83.     Vision has systemically trained and directed its sales agents to market

Vision's goods and services to ADT's customers through the use of false and deceptive

representations, including false claims of affiliation with GE, 2GIG and ADT.

84.      Vision has trained its agents to make these false statements to ADT's

customers with the intent of confusing them, and the market generally for alarm services.

85.     Vision's practices in training its sales agents to solicit customers with false

and misleading sales pitches have in fact created confusion among ADT's customers.

86.     ADT has been damaged and will continue to be damaged as a result of

Vision's practices by the resultant market confusion, by the disruption of ADT's

relationship with its customers, by the diversion of ADT's customers to defendants, and

by damage to ADT's goodwill and reputation as a reliable provider of security services.

87.     ADT has been irreparably harmed by Vision's extensive training of more

than one hundred sales agents in the use of false sales practices.  Most of these agents

have since moved on to other companies, where they will share their recordings and their

knowledge with others.

88.     ADT is entitled to an injunction pursuant to 15 U.S.C. § 1116(a) barring

Vision from training and directing its sales agents to violate the provisions of 15 U.S.C. §

1125(a)(1)(A) and the parties' Agreed Permanent Injunction, and barring Vision from continuing to employ managers and agents known to have engaged in such violations.

89.    ADT is entitled to an award of compensatory damages, as well as Vision's profits, plus attorney fees and the costs of this action pursuant to 15 U.S.C. § 1117(a).

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vision, and award the following relief:

a.    An order pursuant to 15 U.S.C. § 1116(a) that preliminarily, and permanently thereafter, enjoins Vision (including without limitation its owners, agents, servants, employees, officers, managers, members, attorneys, successors and assigns) as follows:

(1)  Vision shall not train its employees or agents to engage in false sales pitches in violation of 15 U.S.C. § 1125(A)(1)(A) or the parties' Agreed Permanent Injunction entered against Vision in the Prior Action ("Prohibited Sales Practices");

(2)  Vision shall not direct its employees or agents to engage in Prohibited Sales Practices;

(3)  Vision shall not employ or otherwise engage any manager or agent, inlcuding Brett Harris, who is known to have used or directed Prohibited Sales Practices in the past, whether for Vision or for any other company;

(4)  Vision shall adopt the following corrective measures to ensure Vision's compliance with the injunctions, and to mitigate some of the damage already caused by Vision's misconduct:

(A) Vision shall create and implement a comprehensive retraining program for all Vision managers and agents, subject to approval by ADT and the Court, by which each Vision manager and agent will be taught not to use Prohibited Sales Practices, including the sales pitches taught by Brett Harris during the 2013 Vision sales season;

(B)  Vision shall create and implement a zero-tolerance policy, subject to approval by ADT and the Court, by which Vision will investigate every allegation of false or deceptive sales practices by any Vision manager or agent, and will immediately terminate the employment of any manager or agent who trained any sales agent to use Prohibited Sales Practices, or who advocated or directed the use of such practices, or who used such practices, *and further*, in the instance of any Vision manager who has instructed or directed agents to use Prohibited Sales Practices, Vision will also terminate all sales agents under the manager's supervision who have engaged in Prohibited Sales Practices, and will again retrain any remaining sales agents according to the methods approved by the Court in the preceding paragraph;

(C)  Vision shall locate, collect and destroy all copies of all audio and video recordings of any Vision training sessions that contain false sales pitches, including but not limited to the training sessions conducted by Brett Harris, ("Recordings") whether in the

hands of current or former Vision managers or agents, *provided, however,* that Vision shall compile a complete set of the Recordings, shall produce the Recordings to ADT as part of Vision's initial disclosures in this Action, and shall stipulate to their authenticity and admissibility at trial of this cause;

(D)  Vision shall give notice to all current and former Vision managers and agents, in a form approved by ADT and the Court, that the use of the sales practices contained in the Recordings violates Federal law and may subject them individually to prosecution and liability;

(E)  Vision shall distribute copies of the Agreed Permanent Injunction and this injunction to each and every one of its employees and agents, together with training and information that explain the reasons for the injunctions, the need for all employees and agents to comply with their requirements, and Vision's policy of terminating the employment of any employee or agent found to have violated the injunctions' prohibitions.

(F)  For a period of three years, Vision shall post an alert in a prominent place on the home page of Vision's corporate website, subject to the approval of ADT and this Court, that alerts the public to Vision's past sales practices, provides a link to the Utah Better Business Bureau page regarding Vision, and posts the texts of the Agreed Permanent Injunction and this injunction.

(G)  For a period of three years, Vision shall create, at Vision's expense and subject to approval by ADT and the Court, third-party monitors who will be given free access to Vision documents, databases, employees, and business activities, who will supervise Vision's training and sales programs (including, without limitation, review and approval of all Vision training scripts and materials, and on-site access to and supervision of Vision's training and sales practices) and who will report their findings each month to ADT and the Court;

(H)  For a period of three years, Vision shall submit its customer lists each month to a third-party vendor, at Vision's expense and subject to approval by ADT and the Court, for comparison with ADT's customer lists to identify ADT customers who have signed Vision contracts, so that ADT may investigate each customer conversion to determine whether Vision has violated its obligations under the governing injunctions; and

(I)  For a period of three years, Vision shall disclose to ADT each month all allegations or complaints that Vision has received of false or deceptive sales practices from consumers, any governmental or regulatory agency, or any private consumer protection group; and

(5)  Such other therapeutic injunctive measures as the Court might find appropriate;

b.     An accounting of Vision's profits resulting from its false and deceptive sales practices, and payment of such profits to ADT;

c.     Compensatory damages, enhanced as provided by 15 U.S.C. § 1117(a), in an amount to be established at trial;

d.     Attorney fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

e.     Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT II
## VIOLATION OF THE FLORIDA DECEPTIVE & UNFAIR
## TRADE PRACTICES ACT, FLA. STAT. §§ 501.201 ET SEQ.

90.     ADT incorporates Paragraphs 1 through 81, as if set forth fully here.

91.     Vision, by selling security systems and services, is engaged in "trade or commerce" as defined in Section 501.203(8) of the Florida Statutes.

92.     Vision has intentionally engaged in deceptive and unfair trade practices in violation of Section 501.204(1) of the Florida Statutes by training and directing its sales agents to use false sales pitches that are designed to mislead customers into believing that the Vision agents are GE technicians visiting at GE's direction to perform an upgrade of the customers' alarm systems as required by local police and fire departments.

93.     These practices are part of a methodical and intentional effort to defraud ADT customers at ADT's expense, conducted with the knowledge of Vision's owner, that occurred while Vision was preliminarily enjoined from misleading ADT's customers in the Prior Action, and that continue even after entry of the Agreed Permanent Injunction by this Court.

94.     Defendants' deceptive and unfair trade practices are likely to (and do) confuse and mislead ADT's customers as to the identity and affiliation of Vision's sales agents, and the customers' relationship with ADT, GE, and other alarm equipment manufacturers.

95.     ADT is entitled to injunctive relief pursuant to Section 501.211(1), Florida Statutes, as a Floridian in competition with Vision, aggrieved by Vision's violations of the Act.  Given the ongoing nature of Vision's misconduct, even in the face of injunctions entered in the Prior Action, Vision is likely to continue to engage in such practices unless this Court takes appropriate measures to enjoin further violations.

96.     ADT has been aggrieved by Vision's violations of the Act, and is entitled to its actual damages suffered as a result of those violations, plus its attorney fees and court costs as provided in Section 501.211(2) of the Florida Statutes.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vision, and award the following relief:

a.      An order pursuant to 15 U.S.C. § 1116(a) that preliminarily, and permanently thereafter, enjoins Vision (including without limitation its owners, agents, servants, employees, officers, managers, members, attorneys, successors and assigns) as follows:

(1)  Vision shall not train its employees or agents to engage in false sales pitches in violation of 15 U.S.C. § 1125(A)(1)(A) or the parties' Agreed Permanent Injunction entered against Vision in the Prior Action ("Prohibited Sales Practices");

(2)  Vision shall not direct its employees or agents to engage in Prohibited Sales Practices;

(3)  Vision shall not employ or otherwise engage any manager or agent, inlcuding Brett Harris, who is known to have used or directed Prohibited Sales Practices in the past, whether for Vision or for any other company;

(4)  Vision shall adopt the following corrective measures to ensure Vision's compliance with the injunctions, and to mitigate some of the damage already caused by Vision's misconduct:

(A)  Vision shall create and implement a comprehensive retraining program for all Vision managers and agents, subject to approval by ADT and the Court, by which each Vision manager and agent will be taught not to use Prohibited Sales Practices, including the sales pitches taught by Brett Harris during the 2013 Vision sales season;

(B)  Vision shall create and implement a zero-tolerance policy, subject to approval by ADT and the Court, by which Vision will investigate every allegation of false or deceptive sales practices by any Vision manager or agent, and will immediately terminate the employment of any manager or agent who trained any sales agent to use Prohibited Sales Practices, or who advocated or directed the use of such practices, or who used such practices, *and further*, in the instance of any Vision manager who has instructed or directed agents to use Prohibited Sales Practices, Vision will also terminate

all sales agents under the manager's supervision who have engaged in Prohibited Sales Practices, and will again retrain any remaining sales agents according to the methods approved by the Court in the preceding paragraph;

(C)  Vision shall locate, collect and destroy all copies of all audio and video recordings of any Vision training sessions that contain false sales pitches, including but not limited to the training sessions conducted by Brett Harris, ("Recordings") whether in the hands of current or former Vision managers or agents, *provided, however,* that Vision shall compile a complete set of the Recordings, shall produce the Recordings to ADT as part of Vision's initial disclosures in this Action, and shall stipulate to their authenticity and admissibility at trial of this cause;

(D)  Vision shall give notice to all current and former Vision managers and agents, in a form approved by ADT and the Court, that the use of the sales practices contained in the Recordings violates Federal law and may subject them individually to prosecution and liability;

(E)  Vision shall distribute copies of the Agreed Permanent Injunction and this injunction to each and every one of its employees and agents, together with training and information that explain the reasons for the injunctions, the need for all employees and agents to comply with their requirements, and Vision's policy

of terminating the employment of any employee or agent found to
have violated the injunctions' prohibitions.

(F)  For a period of three years, Vision shall post an alert in a
prominent place on the home page of Vision's corporate website,
subject to the approval of ADT and this Court, that alerts the
public to Vision's past sales practices, provides a link to the Utah
Better Business Bureau page regarding Vision, and posts the texts
of the Agreed Permanent Injunction and this injunction.

(G)  For a period of three years, Vision shall create, at Vision's
expense and subject to approval by ADT and the Court, third-party
monitors who will be given free access to Vision documents,
databases, employees, and business activities, who will supervise
Vision's training and sales programs (including, without limitation,
review and approval of all Vision training scripts and materials,
and on-site access to and supervision of Vision's training and sales
practices) and who will report their findings each month to ADT
and the Court;

(H)  For a period of three years, Vision shall submit its
customer lists each month to a third-party vendor, at Vision's
expense and subject to approval by ADT and the Court, for
comparison with ADT's customer lists to identify ADT customers
who have signed Vision contracts, so that ADT may investigate

each customer conversion to determine whether Vision has

violated its obligations under the governing injunctions; and

    (I)  For a period of three years, Vision shall disclose to ADT

each month all allegations or complaints that Vision has received

of false or deceptive sales practices from consumers, any

governmental or regulatory agency, or any private consumer

protection group; and

    (5)  Such other therapeutic injunctive measures as the Court might find

appropriate;

    b.      Compensatory damages as provided by Fla. Stat. § 501.211(2), in

an amount to be established at trial;

    c.      Attorney fees and costs incurred in the prosecution of this action,

as provided by Fla. Stat. § 501.211(2); and

    d.      Such other and further relief as the Court may deem appropriate in

the circumstances.

## COUNT III
## UNFAIR COMPETITION

97.    Plaintiff incorporates Paragraphs 1 through 81, as if set forth fully here.

98.    ADT and Vision compete for a common pool of customers.  Both

companies market alarm services to the same target market of residential customers.

99.    Vision has engaged in deceptive and fraudulent misconduct by training

and directing its sales agents to use false sales pitches that are designed to mislead

customers into believing that the Vision agents are GE technicians visiting at GE's

direction to perform an upgrade of the customers' alarm systems as required by local police and fire departments.

100.    Vision's conduct in training its sales agents to use false sales pitches is contrary to honest practice in industrial or commercial matters.

101.    Vision's actions are likely to cause confusion among consumers, and in fact already have caused confusion.

102.    ADT has been injured as a result of Vision's actions.

103.    Vision's training of its sales agents to use false sales pitches occurred even while Vision was preliminarily enjoined by this Court in the Prior Action from resorting to such sales pitches, and has continued even after entry of the Agreed Permanent Injunction in that action.

104.    Accordingly, the Court should award punitive damages in an amount sufficient to deter Vision from continuing to engage in unfair competition in the market for electronic security services.

105.    ADT is entitled to injunctive relief pursuant to Florida common law for Vision's ongoing fraudulent marketing activities.  Given the ongoing nature of Vision's misconduct, even in the face of injunctions entered in the Prior Action, Vision is likely to continue to engage in such practices unless this Court takes appropriate measures to enjoin further violations.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a.    An order pursuant to 15 U.S.C. § 1116(a) that preliminarily, and permanently thereafter, enjoins Vision (including without limitation its owners,

agents, servants, employees, officers, managers, members, attorneys, successors and assigns) as follows:

(1)  Vision shall not train its employees or agents to engage in false sales pitches in violation of 15 U.S.C. § 1125(A)(1)(A) or the parties' Agreed Permanent Injunction entered against Vision in the Prior Action ("Prohibited Sales Practices");

(2)  Vision shall not direct its employees or agents to engage in Prohibited Sales Practices;

(3)  Vision shall not employ or otherwise engage any manager or agent, inlcuding Brett Harris, who is known to have used or directed Prohibited Sales Practices in the past, whether for Vision or for any other company;

(4)  Vision shall adopt the following corrective measures to ensure Vision's compliance with the injunctions, and to mitigate some of the damage already caused by Vision's misconduct:

(A)  Vision shall create and implement a comprehensive retraining program for all Vision managers and agents, subject to approval by ADT and the Court, by which each Vision manager and agent will be taught not to use Prohibited Sales Practices, including the sales pitches taught by Brett Harris during the 2013 Vision sales season;

(B)  Vision shall create and implement a zero-tolerance policy, subject to approval by ADT and the Court, by which Vision will investigate every allegation of false or deceptive sales practices by

any Vision manager or agent, and will immediately terminate the employment of any manager or agent who trained any sales agent to use Prohibited Sales Practices, or who advocated or directed the use of such practices, or who used such practices, *and further*, in the instance of any Vision manager who has instructed or directed agents to use Prohibited Sales Practices, Vision will also terminate all sales agents under the manager's supervision who have engaged in Prohibited Sales Practices, and will again retrain any remaining sales agents according to the methods approved by the Court in the preceding paragraph;

(C)  Vision shall locate, collect and destroy all copies of all audio and video recordings of any Vision training sessions that contain false sales pitches, including but not limited to the training sessions conducted by Brett Harris, ("Recordings") whether in the hands of current or former Vision managers or agents, *provided, however,* that Vision shall compile a complete set of the Recordings, shall produce the Recordings to ADT as part of Vision's initial disclosures in this Action, and shall stipulate to their authenticity and admissibility at trial of this cause;

(D)  Vision shall give notice to all current and former Vision managers and agents, in a form approved by ADT and the Court, that the use of the sales practices contained in the Recordings

violates Federal law and may subject them individually to prosecution and liability;

(E)  Vision shall distribute copies of the Agreed Permanent Injunction and this injunction to each and every one of its employees and agents, together with training and information that explain the reasons for the injunctions, the need for all employees and agents to comply with their requirements, and Vision's policy of terminating the employment of any employee or agent found to have violated the injunctions' prohibitions.

(F)  For a period of three years, Vision shall post an alert in a prominent place on the home page of Vision's corporate website, subject to the approval of ADT and this Court, that alerts the public to Vision's past sales practices, provides a link to the Utah Better Business Bureau page regarding Vision, and posts the texts of the Agreed Permanent Injunction and this injunction.

(G)  For a period of three years, Vision shall create, at Vision's expense and subject to approval by ADT and the Court, third-party monitors who will be given free access to Vision documents, databases, employees, and business activities, who will supervise Vision's training and sales programs (including, without limitation, review and approval of all Vision training scripts and materials, and on-site access to and supervision of Vision's training and sales

practices) and who will report their findings each month to ADT and the Court;

(H)  For a period of three years, Vision shall submit its customer lists each month to a third-party vendor, at Vision's expense and subject to approval by ADT and the Court, for comparison with ADT's customer lists to identify ADT customers who have signed Vision contracts, so that ADT may investigate each customer conversion to determine whether Vision has violated its obligations under the governing injunctions; and

(I)  For a period of three years, Vision shall disclose to ADT each month all allegations or complaints that Vision has received of false or deceptive sales practices from consumers, any governmental or regulatory agency, or any private consumer protection group; and

(5)  Such other therapeutic injunctive measures as the Court might find appropriate;

b.      Compensatory damages in an amount to be established at trial;

c.      Punitive damages in a sum sufficient to deter defendants from engaging in further deceptive and fraudulent misconduct; and

d.      Such other and further relief as the Court may deem appropriate in the circumstances.

## JURY DEMAND

ADT demands a jury trial of all issues triable to a jury.


Dated:  January 29, 2014                    Respectfully submitted,

                                            s/ C. Sanders McNew

                                            _____
                                            C. Sanders McNew
                                            mcnew@mcnew.net
                                            Florida Bar No. 0090561
                                            McNEW P.A.
                                            2385 NW Executive Center Drive
                                            Suite 100
                                            Boca Raton, Florida  33431
                                            Tel:  (561) 299-0257
                                            Fax: (561) 299-3705

                                            *Counsel for the Plaintiff, ADT LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of January, 2014, I caused true and correct copies of the foregoing First Amended Complaint to be served by CM/ECF upon all counsel of record entitled to receive notices of electronic filings in this case.


s/ C. Sanders McNew
_____
C. Sanders McNew