UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-81197-CV-HURLEY/HOPKINS

ADT LLC,

    Plaintiff,

v.

VISION SECURITY, LLC,

    Defendant.
_____/

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**THIS CAUSE** comes before the Court upon Defendant Vision Security, LLC's Motion to Dismiss [ECF No. 46] Plaintiff ADT LLC's Second Amended Complaint [ECF No. 39] for unfair competition in violation of the Lanham Act, § 15 U.S.C. § 1125(a)(1) (Count I), the Florida Deceptive & Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 (Count II), and the common law (Count III).  Defendant moves to dismiss Plaintiff's complaint for failure to comply with a court order, pursuant to Fed. R. Civ. P. 41(b), and to dismiss each count for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6).  For the following reasons, Defendant's motion is granted as to Count II, and denied as to Counts I and III.

### I.    BACKGROUND

Plaintiff ADT LLC ("ADT") is an electronic security company that competes with Security Networks, LLC ("Security Networks") to sell alarm systems across the country.  2d Am. Comp. ¶ 10.  Defendant Vision Security, LLC ("Vision") is an agent of Security Networks.

*Id.* ¶ 3.  ADT and Vision do not manufacture alarm systems, but instead purchase them from manufacturers such as GE Security, Honeywell, and 2Gig.  *Id.* ¶ 11.

Brett Harris is a regional sales manager for Vision, overseeing sales agents in many states.  *Id.* ¶¶ 18, 20.  In 2013, Harris oversaw sales agents in Arizona, Missouri, Kansas, Iowa, and Texas.  *Id.* ¶¶ 20, 22.  As a regional sales manager, Brett Harris also holds training seminars.  In March 2013, Harris held weekly training seminars in Arizona, *id.* ¶¶ 24–26, 27, and, in April 2013, Harris held additional seminars in Missouri and Kansas.  *Id.* ¶ 45.  Some of these seminars were recorded.  *Id.* ¶¶26–27, 43.  In the recordings, Harris instructs Vision's sales agents to use the following sales-pitch:

Vision sales agents are to locate houses with ADT signs, designating the home of an ADT customer.  *Id.* ¶ 44.  They then approach the homeowner and pretend to be a technician "with" an alarm manufacturer such as GE, and "doing business with" ADT.  *Id.* ¶ 28, ¶45.  The sales agents inform the homeowner they are there to provide a free upgrade to the house's alarm system as required by the local fire and police departments.  *Id.* ¶¶ 28, 45.  After replacing the alarm keypad, the salesmen explain to the homeowner that GE prefers Security Networks over ADT for security monitoring.  *Id.* ¶ 28.  As planned, the homeowner then enters into a contract with Security Networks.  *Id.*

According to ADT, most, if not all, of the representations in the sales-pitch are false.  *See id.* ¶ 29–42.  ADT alleges that Vision has used this sales-pitch on customers in California, Illinois, Missouri, Oregon, Nevada, Virginia, and Texas.  *Id.* ¶¶ 58–71.  Many of these ADT customers believed the sales-pitch and signed contracts with Security Networks.  *Id.* ADT also alleges that the recordings of Harris' training have circulated throughout Vision.  *Id.* ¶ 80.  As a result, ADT has sent many agents into the market trained to use this sales-pitch.  *Id.* ¶ 81.

## II.   PROCEDURAL HISTORY

ADT filed suit against Vision and Security Networks on October 12, 2012. *ADT LLC v. Security Networks, LLC*, 12-cv-81120-DTKH.  The complaint alleged that Vision's salesmen visited the homes of ADT's customers where they made false statements about ADT, its products, and its services.  The Court dismissed the case on September 11, 2013, following an August 26, 2013 settlement agreement, releasing claims as of that date, and the entry of an Agreed Permanent Injunction ("the injunction").  The injunction prohibits the following:

> Vision shall not make any false statement regarding the function, performance, capabilities, specification, features, requirements, reliability, availability, or design of any ADT customer's equipment, security systems, or services, or to misrepresent to any ADT customer that such customer's ADT security system is outdated or deficient.

Agreed Permanent Inj. at 2, ¶1.

The injunction also provides a pre-suit procedure by which the parties must resolve any alleged violations of the injunction. *Id.* at 3, ¶ 4.  If ADT believes Vision has violated the injunction, ADT must "notify Vision of the alleged violation, in writing, by stating the name and address of the customer [and] stating the date (if known) and nature of the alleged violation . . . ." *Id.* at 4 ¶4(a).  Upon notification, Vision must investigate the alleged violation and confer with ADT. *Id.* at 4 ¶4(b)–(c).  Thereafter, "in the event ADT and Vision are unable to resolve any alleged violations amongst themselves through [those] procedures . . . , ADT may file a motion or proceeding with this Court alleging such violation." *Id.* ¶ 5.

On November 18, 2013, ADT again filed suit against Vision. *ADT LLC v. Vision Security, LLC*, 13-cv-81197-DTKH.  In its complaint, ADT alleges that ADT customers have reported misconduct by Vision's sales agents that post-date the August 26, 2013 settlement

3

agreement. ADT also alleges that Vision has systematically trained its sales agents to engage in such conduct. ADT summarizes its case as follows:

> . . . ADT has learned that Vision methodically trains its sales agents to lie to ADT's customers, and that Vision continues to send sales agents into the field to sell alarm systems using false sales pitches that are expressly forbidden by the Agreed Permanent Injunction. Because the Agreed Permanent Injunction bars only false pitches by Vision and its agents to ADT customers, and not Vision's own training and direction of its sales force, ADT brings this new action to seek additional relief from Vision's newly-discovered systemic misconduct.

2d Am. Comp. ¶ 1.

The Court stayed the present action pending the parties' notification that they had complied with the pre-suit requirements of the Agreed Permanent Injunction. On July 21, 2014, the parties filed a joint report on their compliance with the injunction. Through their compliance with the pre-suit procedure, the parties have narrowed their list of customer complaints to thirty-five. Although ADT believes that it has discharged its obligations under the Agreed Permanent Injunction, Vision argues that it has not.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

4

## IV.   DISCUSSION

### A. **PERMANENT INJUNCTION**

Vision moves to dismiss ADT's entire complaint, arguing that ADT has failed to comply with the pre-suit procedure of the Agreed Permanent Injunction. *See* Fed. R. Civ. P. 41(b) ("If the plaintiff fails . . . to comply with . . . a court order, a defendant may move to dismiss the action or any claim against it."). According to Vision, ADT should have notified Vision of all its consumer complaints before filing suit against Vision. Because it did not, ADT has violated the court's order and is barred from bringing its present suit.

As a preliminary matter, the Court finds that ADT did not violate the Agreed Permanent Injunction, and that ADT may bring its present suit. The injunction prohibits ADT from filing a motion or proceeding alleging a violation of the injunction without discharging its pre-suit obligations. In this case, ADT has not alleged a violation of the injunction. Instead, it has chosen to bring a separate cause of action for statutory and common law violations. Indeed, ADT *could have chosen* to file a motion or proceeding to enforce the Agreed Permanent Injunction: if the allegations in ADT's complaint were established, the Court would have had no difficulty in finding that a company-approved policy of training sales agents to make false statements violated the injunction. Certainly, by assuming the obligation that its sales agents would not make false statements, Vision also agreed that it would not follow a policy of encouraging that prohibited activity. But ADT did not choose to enforce the injunction, and, accordingly, was not required to discharge its pre-suit obligations. Furthermore, even if ADT did move to enforce the injunction, the Court has already resolved Vision's objection. As previously explained, "[c]ompliance with the [pre-suit] requirement was meant to provide an opportunity for a mutual, good faith effort to resolve any controversy prior to initiating litigation.

5

Contrary to Vision's argument, compliance was not meant to bar a party from bringing its claims to court." Order Staying Action 2. Therefore, neither the injunction nor ADT's compliance with it precludes ADT from bringing its present suit.

## B.  LANHAM ACT VIOLATION

Vision moves to dismiss Count I, arguing that ADT has failed to state a claim under the Lanham Act. Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, reads as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 43(a)(1)(A) of the Lanham Act is codified at § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at § 1125(a)(1)(B). A claim under § 1125(a)(1)(A) is known as a "false endorsement" claim. *See Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012). A claim under § 1125(a)(1)(B) is known as a "false advertising" claim. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts Inc.*, 299 F.3d 1242, 1246 (11th Cir. 2002). Count I of ADT's Complaint claims a general violation of 15

6

U.S.C. § 1125(a)(1).  Although ADT does not specify which subsection it claims Vision violates, for the purpose of this motion, the Court assumes ADT has alleged a violation of both.

To state a claim for false advertising in violation of § 1125(a)(1)(B), a plaintiff must show

> (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce,  and (5) the [plaintiff] has been—or is likely to be—injured as a result of the false advertising.

*Johnson & Johnson*, 299 F.3d at 1247.  Oral statements, if "widely disseminated," are "commercial advertising" under the Lanham Act.  *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002); *Abbott Lab. V. Mead Johnson & Co.*, 971 F.2d 6, 10 (7th Cir. 1992); *Zeneca, Inc. v. Eli Lilly and Co.*, No. 99 Civ. 1452(JGK), 1999 WL 509471, at *31 (S.D.N.Y. July 19, 1999) ("Courts have consistently held that oral statements by a company's sales representative concerning a product constitute 'commercial advertising or promotion' under the Lanham Act."); *Florida Breckenridge, Inc. v. Solvay Pharmaceuticals, Inc.*, No. 97-8417-CIV-RYSKAMP, 1998 WL 468753, at *8 (S.D. Fla. Mar. 18, 1998) ("Runsdorf's oral statements, as a matter of law, constitute commercial advertising.").  When advertisements are made orally by sales agents, courts may consider a defendant's sales training materials to determine the contents of the statements that were made.  *See Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963 (W.D. Wis. 2010) (looking to the defendant helmet manufacturer' slide show presentations to its sales agents to determine the "sales pitch" they may have used with customers); *Zeneca, Inc. v. Eli Lilly and Co.*, No. 99 Civ. 1452(JGK), 1999 WL 509471, at *9 (S.D.N.Y. July 19, 1999) (examining the defendant drug manufacturer's "selling

scripts," instructing its sales representatives what to say, to determine the statements they made to physicians about a drug's efficacy).

The Court need not parse Vision's entire sales pitch, for at least of its three statements are allegedly false, and sufficient to state a claim under the Lanham Act. In Vision's March and April 2013 training seminars, Vision instructs its salesmen to state that they are "with GE," that local police and fire departments require the homeowner to upgrade his system, and that GE encourages homeowners to switch from ADT to Security Networks. ADT alleges that none of these statements are true, and Vision does not argue that they are. Because these statements are "literally false," the Court may presume that that they could—or did—deceive consumers. *See Osmose, Inc. v. Viance, LLC*, 612 F. 3d 1298, 1319 (11th Cir. 2010) ("If the court deems an advertisement to be literally false, then the [plaintiff] is not required to present evidence of consumer deception."). The Court is also not concerned that these false statements had a material effect on consumers' purchasing decisions. To satisfy materiality, a plaintiff need only show that a defendant's "deception is likely to influence the [consumer's] purchasing decision." *Johnson & Johnson*, 299 F.3d at 1250 (internal quotation marks omitted). The use of GE's name and endorsement, as well as a statement that police and fire departments require the homeowner to change his alarm system, likely influenced each consumer's decision to change their alarm keypad and switch from ADT to Vision. *See Osmose*, 612 F.3d 1298 (finding that, where an advertisement misrepresented a well-known company's role in the defendant's wood preservative product testing, the advertisement's "heavy reliance on [that company's] independence and reputation enhances the likelihood that misrepresentation would influence purchasing decisions"). As to the jurisdictional requirement, it is more than sufficient that Vision trains agents in multiple states, advertises in multiple states, and sells its service in

8

multiple states to satisfy the requirement that its service affects interstate commerce. *See Jillibeans, Inc.v .Skating Clubs of Ga., Inc.*, 716 F.3d 833 (finding that a Georgian roller-rink satisfied the jurisdictional requirement of § 1125 when it sought patrons from "parts of Alabama," "receiv[ed] some out-of-state convention business," and "received some free publicity in national magazines."). Finally, Vision's training and its sales agents' false statements have no doubt injured ADT. Not only has Vision's conduct caused ADT to lose customers, but it may have also damaged ADT's goodwill. *See Osmose*, 612 F.3d 1298 (holding a preliminary injunction could issue for a false advertising claim when the advertisements posed a reasonable threat to the plaintiff's "goodwill and market position").

In addition to false advertising under § 1125(a)(1)(B), ADT has also stated a claim for false endorsement under § 1125(a)(1)(A). A claim for false endorsement is a claim for "trademark infringement." *See Univ. of Ala.*, 683 F.3d at 1278 ("[W]e have never treated false endorsement and trademark infringement claims as distinct under the Lanham Act."); *Tana v. Dantanna's*, 611 F.3d 767, 777 n.9 (11th Cir. 2010) ("[W]e have . . . never recognized a separate claim of false endorsement, distinct from trademark infringement under § 43(a) . . . ."). To state a claim for false endorsement, or trademark infringement, a plaintiff must show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997).[1] ADT customers have complained that Vision agents have visited their homes and affirmatively represented themselves as "with" or "on behalf of" ADT. *See id.* ¶ 70, 76. Only after tampering with the customers' alarms do the sales agents disclose their

---

[1] The Court takes judicial notice that ADT claims trademark rights in "ADT." *See* ADT, *Trademark, Copyright and Proprietary Information Notice*, http://www.adt.com/about-adt/legal/trademark (last visited July 29, 2014).

9

relationship with Vision. *See id.* at ¶ 64. Implying an association with one company to procure business for another is the type of false endorsement and "bait-and-switch" tactic that § 1125(a)(1)(A) Act prohibits. *See Suntree Tech., Inc. v. Ecosense, Int'l., Inc.*, 693 F.3d 1338, 11346 (11th Cir. 2012) ("The dispositive issue in this case is whether . . . [the defendant] used [the plaintiff's] reputation to win a bid and then used a 'bait-and-switch' tactic to substitute [the co-defendant's] baffle boxes for those of [the plaintiff].").

In Vision's defense, Vision has, at least once, specifically instructed its sales agents to disavow any direct relationship with ADT:

> BRETT HARRIS:  So how many of you guys are getting stuck when they say, well, are you with ADT?  A lot of you guys. That's when you, you convert that and you say, no, remember, I told you I'm with 2GIG Technology or I'm with GE, okay?  And we provide the equipment that's in the homes for most of the security companies, okay?

2d Am. Comp. ¶ 45.  Nonetheless, some of Vision's sales agents may not have followed this instruction.  Because Vision's sales agents have represented a relationship with ADT, and used that relationship to procure business for Vision, Vision has committed false endorsement under the Lanham Act.  While Vision's false endorsement may not be as systematic as its false advertising, ADT has not failed to state a claim.

### C.  APPLICATION OF FLORIDA LAW

Vision moves to dismiss Counts II and III by arguing that because Florida law does not apply, ADT fails to state a claim under the FDUTPA and common law.  As to ADT's FDUTPA claim, Vision is correct.

A federal court with diversity or supplemental jurisdiction must apply the substantive law of its forum state.  *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004).  Choice of law rules are substantive.  *LaFarge Corp. v. Travelers, Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir.

1997). To choose the substantive law for a tort claim, Florida courts ask which state "has the most significant relationship to the occurrence and the parties . . . ." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (adopting the Restatement (Second) of Conflict of Laws § 145 (1971)); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2011).[2] To determine the state with the most significant relationship, a court must consider "the place where the injury occurred," "the place where the conduct causing the injury occurred," "the domicil, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship, if any, between the parties is centered." *Bishop*, 389 So. 2d at 1001 (quoting Restatement (Second) of Conflict of Laws § 145). When the plaintiff claims "unfair competition," the court should "give[] particular weight" to the place where the conduct causing the injury occurred. Restatement (Second) of Conflict of Laws § 145 cmt. f ; *see Grupo Televisa*, 485 F.3d at 1241 (faulting the district court for ignoring that the place of conduct is the "single most important contact" in an unfair competition case for misappropriation of trade values) (citing Restatement (Second) Conflict of Laws § 145 cmt. f)). The Restatement gives greater weight to the place of conduct rather than the place of injury because economic injury for unfair competition will usually occur in more than one state. *See* Restatement (Second) of Conflict of Laws § 145 cmt. f. ("The effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or

---

[2] The Restatement (Second) Conflict of Laws § 6 (1971) also requires courts, in all areas of law, to consider the following: "the needs of the interstate and international systems," "the relevant policies of the forum," "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," "the protection of justified expectations," "the basic policies underlying the particular field of law," "certainty, predictability and uniformity of result," and "ease in the determination and application of the law to be applied." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (quoting Restatement (Second) of Conflict of Laws § 145).

principal place of business. But this place may have only a slight relationship to the defendant's activities and to the plaintiff's loss of customers or trade.").

In the present case, Florida does not have "the most significant relationship to the occurrence and the parties." ADT does not allege a specific state where the injury occurred and, as the Restatement suggests, the injury could occur in many states. Although as pure economic loss, the injury most likely occurred in ADT's headquarters in Florida, the injury also occurred where ADT alleged it lost customers, such as Texas, California, and Virginia. Even if the Court presumed that ADT's injury occurred mostly in Florida, because ADT claims unfair competition the Court must instead more heavily weigh the place of the injurious conduct. In this case, the training seminars took place in Arizona, Missouri, and Kansas; they did not take place in Florida. Furthermore, although the training tapes circulated throughout Vision, ADT never alleges that they circulated to Florida. Nor can the Court infer that they did: ADT alleges that Vision's salesmen used its sales-pitch on customers in California, Illinois, Missouri, Oregon, Nevada, Virginia, and Texas, but does not allege they used it in Florida. Except for ADT's lawsuit, Vision has no relationship to Florida. In sum, Florida does not have the most significant relationship to either the parties or to the occurrence.

When a district court determines that Florida law does not apply, a plaintiff lacks standing to bring a suit under the FDUTPA. *See e.g., Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 225–26 (S.D. Fla. 2002) ("The Plaintiff herein brings his action under one Florida statute—FDUTPA. However, his individual claim is more appropriately brought under the analogous Texas deceptive trade practices act under the undisputed facts in this case. As a result, he lacks standing to bring his claim."), *cited in Hutson v. Rexall Sundown, Inc.*, 837 So.2d 1090, 1094 (Fla. 4th DCA 2003) (declining to apply the FDUTPA and to certify a class of

Case 9:13-cv-81197-DTKH   Document 69   Entered on FLSD Docket 07/30/2014   Page 13 of 13

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint
*Plaintiff v. Defendant*, No. 13-81197-CV-Hurley/Hopkins

consumers because to do so "would require the application of consumer protection laws from each of the states where the deceptive trade practice occurred and the non-resident claimants suffered injury"). However, because ADT alleges "unfair competition" generally, without specifying a particular state, and because it states a claim under the Lanham Act, ADT may state a claim for unfair competition in the laws of the applicable state. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n. 4 (11th Cir.2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition.") Although absent a motion to determine governing law the Court does not decide which state's laws govern, the Court has decided, for the purpose of this motion to dismiss, that Florida's laws do not.

## CONCLUSION

For the aforementioned reasons, it is hereby

**ORDERED** and **ADJUDGED** that:

1. Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint [ECF No. 46] is **GRANTED IN PART AND DENIED IN PART**.

2. Count II of Plaintiff's Second Amended Complaint [ECF No. 39] is **DISMISSED WITH PREJUDICE**.

**DONE** and **SIGNED** in Chambers at West Palm Beach, Florida this 30th day of July, 2014.

Daniel T. K. Hurley
United States District Judge

*Copies provided to counsel of record*